UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20362-CR-ALTONAGA

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

LEROY LENROY JACKSON,

     Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Leroy Lenroy Jackson's Motion to Dismiss Indictment ("Motion") [ECF No. 25], filed July 16, 2010.  The Court has considered the parties' written submissions and the applicable law.

## I. BACKGROUND

After entering the United States in 1981 and repatriating back to Jamaica that same year, the Defendant returned to the United States at an unknown date and time and applied for legal residency under the name Leroy Denton Jackson.   (*See* Resp. 1 [ECF No. 28]).  The Defendant was granted temporary resident status.  (*See id.*).  In 1988, the Defendant married a U.S. citizen but then left the United States and returned to Jamaica.  (*See id.*).  The Defendant again reentered the United States on September 7, 1989 as a conditional resident, based on his marriage.  (*See id.* Ex. A [ECF No. 28-1]).  After two years as a conditional resident, the Defendant became a Lawful Permanent Resident ("LPR") and was issued a resident alien card – a "green card."  (*See id.* 2).

In 1995, immigration authorities encountered the Defendant while he was serving a federal prison sentence for drug trafficking.  (*See id.*).  After the Defendant served his federal sentence, he

Case No. 10-20362-CR-ALTONAGA

was placed in immigration removal proceedings and ordered deported to Jamaica on May 8, 1998. (*See id.*).  He was physically removed from the United States on July 23, 1998 (*see id.* Ex. B) and designated an aggravated felon under immigration law, permanently barring him from the United States. (*See id.* 2).  Prior to his physical removal, the Government gave the Defendant written notice that he was permanently barred from entering the United States.  (*See id.* Ex. C).

The Defendant has reentered the United States on two occasions since being deported on July 23, 1998.  (*See id.* 2).  The first time was on January 13, 1999 when he arrived in Port Canaveral, Florida as a stowaway on board a vessel.  (*See id.*). The Defendant was returned to Jamaica on January 14, 1999.  (*See id.* Ex. D).  The second reentry occurred on December 5, 1999.  A "Commercial Air Border Crossing" confirmed the Defendant was a passenger on a plane inbound from Jamaica to Miami International Airport.  (*See id.* 3).  The Defendant presented his invalid green card and Jamaican passport to an inspector at the airport and was subsequently admitted into the United States.  (*See id.*).

The Defendant has been living in the United States since his reentry, openly working and filing income tax returns.  (*See* Mot. 2).  On April 3, 2010, the Defendant was arrested for a traffic violation.  (*See id.* 2).  Miami-Dade County officials notified the Immigration and Customs Enforcement ("ICE"), which confirmed the Defendant had previously been removed from the United States in July 1998, was not a citizen, and had not received permission to reenter.  (*See id.*).  The Defendant has now been indicted and charged with illegal reentry under 8 U.S.C. §§ 1326(a) and (b)(2) (*see* Indictment [ECF No. 8]), and he moves to dismiss the Indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure.

Case No. 10-20362-CR-ALTONAGA

## II.  ANALYSIS

Under 8 U.S.C. § 1326(a), it is illegal for an alien, after having been removed from the United States, to enter, attempt to enter, or be "found in" the United States without having expressly received permission from the Attorney General or his successor, the Secretary for Homeland Security.  The statute of limitations for section 1326(a) is five years.  *See* 18 U.S.C. § 3282.[1]

The Defendant contends he was "found in" the United States on December 5, 1999 when customs officials allowed him to enter the United States through Miami International Airport.  The Defendant maintains the statute of limitations began to run on December 5, 1999, and the current prosecution for illegal reentry is time-barred.  The Government contends the Defendant was "found in" in the United States on April 3, 2010 after the Defendant was arrested by the Miami-Dade Police Department and the federal immigration authorities became aware the Defendant was in the United States.  The Government asserts the statute of limitations in this case began to run on April 3, 2010, and the current prosecution for illegal reentry is timely.

In general, the five-year statute of limitations begins to run when the alien is "found in" the United States by federal immigration officials.  *United States v. Clarke*, 312 F.3d 1343, 1346 (11th Cir. 1995).  Although the Government has misquoted *United States v. Rivera-Ventura*, 72 F.3d 277 (2d Cir. 1995) (*see* Resp. 4), the Government did correctly set forth the proposition that when a

---

[1] § 3282. Offenses not capital

(a) In general. Except as otherwise expressly provided by law, no person shall be prosecuted, tried or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

3

Case No. 10-20362-CR-ALTONAGA

defendant reenters the country after deportation using an invalid green card or other "specious documentation," he conceals the illegality of his presence and the statute of limitations is not triggered at the time of entry. *Id.* at 281–82. The commission of the offense of being "found in" the United States "is not complete for statute of limitations purposes until authorities both discover the illegal alien in the United States, . . . and know, or with the exercise of diligence typical of law enforcement authorities could have discovered," the illegality of his or her presence. *Id.* at 282 (internal citation omitted). "What constitutes reasonable diligence will . . . vary with the facts and circumstances of each case." *United States v. Palomino Garcia*, 606 F.3d 1317, 1323 (11th Cir. 2010).

In *United States v. Acevedo*, 229 F.3d 350 (2d Cir. 2000), the defendant reentered the United States in 1991 through Miami International Airport after being deported to the Dominican Republic. *See id.* at 353. Acevedo failed to surrender his green card at the time of deportation. *See id.* Upon reentry, Acevedo used his real name and presented his social security card, Dominican passport, and invalid green card. *See id.* at 353–54. Four years later, in 1995, immigration authorities were notified Acevedo was serving time in prison and sought to prosecute him for illegal reentry. *See id.* at 356.

Acevedo asserted the statute of limitations began to run on his illegal reentry case in 1991 when he entered the United States at Miami International Airport. *See id.* at 355. Unpersuaded, the court held the statute of limitations began to run in 1995 when immigration authorities were made aware Acevedo was in prison and could determine his illegal status, and a prosecution for illegal reentry in 1997 was thus within the statute of limitations. *See id.* at 356. The court found that "a

4

Case No. 10-20362-CR-ALTONAGA

deportee who gains readmission to the United States by presenting an invalid travel document to the immigration authorities does so 'by means of specious documentation that conceals the illegality of his presence'" and thus, the statute of limitations for the offense of being found in the United States after removal is not triggered at the time of reentry. *Id.* at 355 (quoting *Rivera-Ventura*, 72 F.3d at 281).

The facts in *Acevedo* are analogous to the facts alleged in this case. Use of a revoked green card is unlawful after one has failed to surrender it upon deportation, *see* 8 C.F.R. §§ 246.9, 247.14, and the Defendant in the instant case, like Acevedo, failed to surrender his green card at the time of deportation and reentered using an invalid green card. Like Acevedo, the Defendant maintains the statute of limitations began to run on the date he reentered using the invalid green card. But the Defendant was barred from reentering the United States and had no right to return to or live in the United States after he was deported on July 23, 1998. When the Defendant reentered in 1999, the use of the green card effectively concealed his identity. That the Defendant used the green card knowing it was invalid demonstrates the use of specious documentation concealing the illegality of his presence. *See generally United States v. Wallace*, No. 96-1340, 1997 WL 49975, at *1 (2d Cir. Jan. 15, 1997) (referenced in "Table of Decisions Without Reported Opinions" at 107 F.3d 5). Thus, consistent with *Acevedo*, the statute of limitations for the Defendant's illegal reentry began to run on April 3, 2010.

The Defendant asserts *Acevedo* was incorrectly decided and is distinguishable. (*See* Mot. 3). He maintains the *Acevedo* court should have made its determination by considering whether there were tools available to immigration officials at the time that could alert them to Acevedo's illegal

5

reentry rather than relying on the manner of his entry.  (*See id.* at 4; *but see* Reply 2 [ECF No. 29]).

The *Acevedo* decision does not turn on the tools available to authorities at the time.  Instead, the

court found the manner of the defendant's entry concealed the fact that his presence was illegal.  *See*

*Acevedo*, 229 F.3d at 355.  The court emphasized this type of entry did not alert immigration

authorities to the defendant's presence.  *See id.* ("[A] deportee's presentation of an invalid green

card, particularly when accompanied by an apparently valid passport, does 'not place the INS on

notice that his presence in the United States [is] illegal,' . . . even if the alien uses his real name.")

(quoting *United States v. Almonte*, No. 98 Cr. 666(JFK), 1998 WL 782023, at *3 (S.D.N.Y. Nov.

6, 1998) (internal citations omitted)).

The Defendant also attempts to distinguish *Acevedo* from his case by pointing out that the

court in *Acevedo* relied heavily upon *Almonte*, 1998 WL 782023, at *1, and *United States v. Gay*,

7 F.3d 200 (11th Cir. 1993), and that these cases turned on the tools available to officials at the

relevant times.  (*See* Mot. 4–6).  This interpretation is incorrect.  In *Almonte*, the court discussed the

tools available to immigration authorities as a secondary consideration, but the court's primary focus

was on the invalid green card the defendant used for reentry.  *See* 1998 WL 782023, at *3

("Defendant's presentation of a green card to which he was not entitled did not place the INS on

notice that his presence . . . was illegal. . . . Even if the inspector doubted the validity of the green

card, the equipment available to him . . . would not have contained information concerning

Defendant's deportation.").  The facts in *Gay* are distinguishable from *Acevedo* in that the invalid

document used by Gay to reenter the United States was a passport, not a green card.  *See* 7 F.3d at

Case No. 10-20362-CR-ALTONAGA

201.  The court in *Gay* found this manner of entry was illegal, and the defendant was "found in" the United States following this reentry.  *Id.* at 202.

The green card in *Acevedo* and the passport in *Gay* were both invalid documents for different reasons, but the documents were used to reenter the United States through recognized ports of entry. Both cases support the conclusion that the Defendant can be prosecuted for illegal reentry.  Although the court in *Gay* does not explicitly categorize the passport as a "specious" document, the correlation can be made because of the way the document was used.  The Defendant maintains the court's discussion in *Gay* of the lookout system in place at the time of Gay's reentry suggests the "tools available" analysis was the primary consideration.  (*See* Mot. 6).  However, language directly supporting Defendant's argument that the presence of a lookout system, or lack thereof, was a determinative factor does not appear in the opinion.

The Defendant cites *Palomino Garcia*, 606 F.3d at 1323, to support his contention that immigration officials had the "available equipment" to enable them to conduct a necessary investigation into whether the reentry was illegal.  (*See id.*).  The court, in holding immigration authorities did not fail to act with reasonable diligence given the information provided them in 2002, observed that reasonable diligence will vary with the facts and circumstances of each case.  *See id.* The Defendant contends the Government has not provided sufficient case law or other authority, such as supporting affidavits from knowledgeable immigrations officials, to demonstrate the tools available to immigration authorities in 1999 at Miami International Airport.  (*See* Reply 3). However, such a showing is not necessary as the Defendant's manner of reentry is determinative – not the tools available to immigration authorities.

7

Case No. 10-20362-CR-ALTONAGA

Even if the Court discounts the Defendant's use of an invalid green card, the "tools available"

analysis does not weigh against the reasonable diligence of the immigration authorities. The

Government provides information to suggest immigration authorities at the airport used the

information available to them at the time. When the Defendant entered the United States in 1999,

there were no immigration "lookouts" in the system alerting the inspector that the Defendant had

been previously deported.[2] Given the Defendant's use of a green card he knew to be invalid and the

procedural mechanisms and tools available to the immigration authorities at the airport in 1999, a

conclusion that diligence was substandard for the time will not be made at this time. *See United*

*States v. Mercedes*, 287 F.3d 47, 55 (2d Cir. 2002) (efforts of INS did not fall short of diligence

typical of federal immigration authorities); *United States v. Torkington*, 812 F.2d 1347, 1354 (11th

Cir. 1987) ("Under Fed. R. Crim. P. 12(b) an indictment may be dismissed where there is an

infirmity of law in the prosecution; a court may not dismiss an indictment . . . on a determination of

facts that should have been developed at trial.").

The Defendant was admitted in 1999 into the United States using his invalid green card and

Jamaican passport. Where a defendant enters the country in such a manner, and in the absence of

other facts, the Government is not on notice for purposes of the statute of limitations. The statute

of limitations began to run on April 3, 2010 when the Defendant was arrested and immigration

---

[2] It was not until 2003 that ICE joined with the United States Customs Service (later called the United States Customs Border Protection) to implement several statutes designed to enhance immigration controls. These statutes required the Department of Homeland Security to use available data to match alien arrival and departure records and to use biometrics to deprive criminals of the ability to cross United States borders using fraudulent documents. *See* http://customs.gov. According to the Government, in 1999, when the Defendant entered the United States, these safeguards did not exist, and consequently notice of a prior deportation would not be known to a customs official at the airport. (*See* Gov't's Resp. 6).

officials were made aware of his illegal presence in the United States.  Therefore, the Indictment for

illegal reentry is timely.

### III.  CONCLUSION

Consistent with the foregoing analysis, it is

**ORDERED AND ADJUDGED** that the Defendant's Motion **[ECF No. 25]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 17th day of August, 2010.


_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record